WO

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Michael D. Draper,<br><br>     Plaintiff,<br><br>v.<br><br>Carolyn W. Colvin,<br><br>     Defendant. | No. CV-15-01211-PHX-DGC<br><br>**ORDER** |

  Plaintiff Michael D. Draper seeks review under 42 U.S.C. § 405(g) of the final decision of the Commissioner of Social Security which denied him disability insurance benefits and supplemental security income under sections 216(i), 223(d), and 1614(a)(3)(A) of the Social Security Act.  Because Draper has not identified any reversible error, the Court will affirm.

**I. Background.**

  Draper is a 57-year-old male who previously worked as an office machine servicer and kitchen helper.  A.R. 23.  Draper originally applied for disability insurance benefits and supplemental security income on November 26, 2007.  A.R. 10.  Draper asserted disability beginning February 15, 2006 and ending December 13, 2008.  *Id.*  The ALJ found that Draper was disabled during this period and awarded benefits.  *Id.*

  On October 19, 2011, Draper filed a second application, alleging disability beginning October 15, 2011.  A.R. 10, 13.  On October 28, 2013, an ALJ held a hearing

on Draper's application. A.R. 34-74. Draper appeared with his attorney and testified. A vocational expert also testified. *Id.*

On January 17, 2014, the ALJ issued a decision that Draper was not disabled within the meaning of the Social Security Act. A.R. 10-25. The decision proceeded according to the five-step evaluation process set forth at 20 C.F.R. § 404.1520(a)(4). At step one, the ALJ found that Draper met the insured status requirements of the Social Security Act through December 31, 2016, and that he had not engaged in substantial gainful activity at any time between the alleged onset date and the date of decision. A.R. 13. At step two, the ALJ found that Draper had the following severe impairments: status post partial right nephrectomy, bipolar disorder, and cognitive disorder. *Id.* At step three, the ALJ determined that Draper did not have an impairment or combination of impairments that met or medically equaled an impairment listed in Appendix 1 to Subpart P of 20 C.F.R. Pt. 404. A.R. 14. At step four, the ALJ found that Draper had the residual functional capacity to perform:

> medium work as defined in 20 CFR 404.1567(c) and 416.967(c) except the claimant can occasionally climb ladders, ropes, scaffolds, ramps, and stairs, as well as occasionally balance, stoop, crouch, kneel, and crawl. He should avoid concentrated exposure to nonweather related extreme heat, excessive vibration, dangerous machinery, and unprotected heights. Further, the claimant should avoid driving on the job. He retains the ability to perform simple, routine, and repetitive tasks. The claimant can engage in occasional interaction with the public, co-workers, and supervisors, and can still be in the vicinity of others. He should avoid sales work with the public. Finally, the claimant retains the ability to be employed in a low stress job, which is defined as only occasional and simple decision making required, occasional changes in the work setting, and no fast-paced production rate requirements.

A.R. 16. The ALJ found Draper unable to perform any of his past relevant work. A.R. 23. At step five, the ALJ concluded that, considering Draper's age, education, work experience, and residual functional capacity, there were jobs existing in significant numbers in the national economy that Draper could perform, including dining room attendant, cleaner/housekeeper, and hand packager. A.R. 24.

The Appeals Council denied Draper's request for review of the hearing decision, making the ALJ's decision the Commissioner's final decision. A.R. 1. Draper seeks

review in this Court, arguing that the ALJ's decision improperly discounted his symptom testimony as well as the medical opinions of treating psychiatrist Hilda Amato, M.D., and examining psychologist Donald Nockleby, Ph.D.

## II. Legal Standard.

The district court reviews only those issues raised by the party challenging the ALJ's decision. *See Lewis v. Apfel*, 236 F.3d 503, 517 n.13 (9th Cir. 2001). The court may set aside the Commissioner's disability determination only if the determination is not supported by substantial evidence or is based on legal error. *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007). Substantial evidence is more than a scintilla, less than a preponderance, and relevant evidence that a reasonable person might accept as adequate to support a conclusion considering the record as a whole. *Id.* In determining whether substantial evidence supports a decision, the court must consider the record as a whole and may not affirm simply by isolating a "specific quantum of supporting evidence." *Id.* As a general rule, "[w]here the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld." *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002) (citations omitted).

## III. Medical Source Evidence.

### A. Dr. Hilda Amato.

Draper has been a patient of Dr. Amato since September 2012. A.R. 1227. On March 15, 2013, Dr. Amato completed a residual functional capacity questionnaire at Draper's request. A.R. 1375-77. Dr. Amato opined that Draper was moderately limited in his ability to carry out simple instructions and to make judgments on simple work-related objectives. AR. 1375. She further opined that Draper was severely limited in his ability to understand and remember simple instructions, to interact appropriately with the public, supervisors, and co-workers, and to respond appropriately to work pressures. *Id.* She also indicated that Draper would be "off task" thirty percent of the time during an eight-hour work day, and that he would be half as efficient as an average worker on a sustained basis. A.R. 1376.

1    Dr. Amato's opinion is contradicted by other doctors, including the consultative
2 examiner Renee Behinfar, Psy.D., and the state agency physicians. A.R. 21. Therefore,
3 the Court must determine whether the ALJ offered specific and legitimate reasons for
4 rejecting Dr. Amato's opinion – that is, whether the ALJ offered "a detailed and thorough
5 summary of the facts and conflicting clinical evidence." *Cotton v. Bowen*, 799 F.2d
6 1403, 1408 (9th Cir. 1986).

7    The ALJ offered the following explanation for her treatment of Dr. Amato's
8 opinion:

> The doctor apparently relied quite heavily on the subjective report of symptoms and limitations provided by the claimant, and seemed to uncritically accept as true most, if not all, of what the claimant reported. Yet, as explained elsewhere in this decision, there exist good reasons for questioning the reliability of the claimant's subjective complaints. This physician's own reports fail to reveal the type of significant clinical and laboratory abnormalities one would expect if the claimant were in fact disabled, and the doctor did not specifically address this weakness. Finally, the undersigned notes no specific work limitations were offered and this source checked boxes on a form.

15 A.R. 22 (internal citations omitted). Thus, the Court must determine whether any of the
16 following constitutes a specific and legitimate reason for discounting Dr. Amato's
17 opinion: (1) her reliance on Draper's reported symptoms; (2) the purported absence of
18 supporting evidence in her records; (3) her failure to identify "specific work limitations";
19 and (4) her use of a check-box form.

20    The ALJ's first reason for discounting Dr. Amato's opinion – that she "uncritically
21 accept[ed]" Draper's reported symptoms – is not specific and legitimate. An ALJ is not
22 entitled to "reject[] an examining physician's opinion by questioning the credibility of the
23 patient's complaints where the doctor does not discredit those complaints and supports
24 his ultimate opinion with his own observations." *Ryan v. Comm'r*, 528 F.3d 1194, 1199-
25 1200 (9th Cir. 2008). The ALJ did not identify anything in the record "to suggest that Dr.
26 [Amato] disbelieved [Draper's] description of [his] symptoms, or that Dr. [Amato] relied
27 on those descriptions more heavily than [her] own clinical observations" in reaching her
28 medical conclusions. *Id.* To the contrary, in every treatment note, Amato included her

- 4 -

own impressions regarding Draper's hygiene/appearance, alertness, eye contact, affect, mood, speech, attitude, thought process, thought content, concentration, and memory. The Court cannot agree that Amato uncritically accepted Draper's reported symptoms.

The ALJ's third and fourth reasons for discounting Amato's opinion can also be quickly rejected.  It is simply incorrect to assert that "no specific work limitations were offered" in Amato's opinion.  Amato identified specific limitations related to Draper's memory, social skills, and ability to tolerate stress.  A.R. 1375.  These limitations were specific enough for the vocational expert, who testified that an individual suffering from the specified limitations would be unable to obtain work existing in significant numbers in the national economy.  A.R. 67-68.  Similarly, as the Commissioner concedes (Doc. 20 at 12), Amato's use of a check-box form is not a valid basis for discounting her opinion unless that opinion is inconsistent with the underlying clinical records.  *See Garrison v. Colvin*, 759 F.3d. 995, 1014 n.17 (9th Cir. 2014) ("the ALJ was [not] entitled to reject [medical] opinions on the ground that they were reflected in mere check-box forms" where the "check-box forms did not stand alone" but instead "reflected and were entirely consistent with the hundreds of pages of treatment notes").

The ALJ's second reason for discounting Amato's opinion was the absence of supporting evidence in her treatment notes.  Although Amato's opinion indicates that Draper suffers from debilitating symptoms, Amato's treatment notes consistently describe Draper's symptoms as "moderate" or "mild," with only one note describing his symptoms as "marked."[1]   A.R 1391-94.  Although Amato's opinion indicates that Draper's social skills are severely limited, Amato consistently reported that Draper's attitude was cooperative and friendly, his hygiene and appearance good or average, his

---

[1] A.R. 1385-87 (notes from July 9, 2013, reporting "moderate" symptoms), 1388-90 (notes from May 21, 2013, reporting "moderate" symptoms), 1400-02 (notes for February 26, 2013, reporting "moderate" symptoms), 1220-21 (notes from January 1, 2013, reporting "moderate" symptoms), 1223-24 (notes from December 28, 2012, reporting "mild" symptoms), 1225-26 (notes from September 27, 2012, reporting "moderate" symptoms), 1227-29 (notes from September 18, 2012, reporting "moderate" symptoms).

- 5 -

eye contact fair or good, and his affect appropriate.  *See* A.R. 1219, 1223, 1227, 1385.[2] Similarly, although Amato indicated that Draper's memory was severely impaired, she found his memory to be intact and his concentration to be good or fair on three occasions. *See* A.R. 1220, 1223, 1401.  The ALJ reasonably concluded that Dr. Amato's opinion was not fully consistent with her treatment notes, and that the opinion should receive less weight for that reason.

### B.     Dr. Donald Nockleby.

On January 2, 2013, Dr. Nockleby completed a comprehensive neurophysiological evaluation of Draper at the request of Vocational Rehabilitation.  A.R. 1183-95.  Dr. Nockleby diagnosed Draper with bipolar disorder and cognitive disorder and assessed a GAF score of 65.  A.R. 1195.  He found that Draper's performance pace was average, that he followed directions without difficulty, and that his speech was well-articulated. A.R. 1187.  Although Draper's mood was mildly depressed, his thought process was free of psychotic elements and his interpersonal skills were acceptable.  *Id.*  The SCL-90-R test indicated mild-to-moderate distress.  A.R. 1187-88.  The MMPI-2 test produced results that were "mostly in the normal range."  A.R. 1188.  Draper's attention-concentration skills were "mostly average."  A.R. 1189.  His IQ, verbal comprehension index, perceptual reasoning index, processing speed index, and working memory index were all average.  A.R. 1191.  There was evidence, however, that Draper suffered from memory impairment and that his ability to tolerate stress was limited.  A.R. 1192.

With regard to Draper's desire to return to work, Dr. Nockleby offered the following:

> The likelihood is that the client's difficulties in executive functioning will not just 'disappear' on a job. . . He has had considerable instability of the mood disorder during the past couple years, requiring several hospitalizations. . .  The answer seems to be clear that he needs to take work re-entry a 'step at a time' and not get into training or work that is very demanding, especially initially.  His idea is that he can tolerate full time work; this is overly optimistic at this time.

---

[2] Amato also found Draper's hygiene, appearance, and eye contact to be poor, and his affect to be blunted, on several occasions.  A.R. 1385, 1388, 1394, 1400.  However, Draper remained cooperative throughout.

A.R. 1193-94.

In April 2013, Dr. Nockleby completed a residual functional capacity questionnaire at Draper's request. A.R. 1272-73. Dr. Nockleby opined that Draper was extremely limited in his ability to understand and remember detailed instructions, seriously limited in his ability to respond appropriately to work pressures, and moderately limited in his ability to understand and carry out simple instructions. A.R. 1272. Dr. Nockleby further opined that Draper would be less than half as efficient as an average worker on a sustained basis. A.R. 1273.

Dr. Nockleby's opinion is contradicted by other doctors, including the consultative examiner Renee Behinfar, Psy.D., and the state agency physicians. A.R. 21. Therefore, the Court must determine whether the ALJ offered specific and legitimate reasons for rejecting Dr. Nockleby's opinion. *Cotton*, 799 F.2d at 1408.

After reviewing Dr. Nockleby's clinical findings, the ALJ offered the following explanation for treatment of Dr. Nockleby's opinion:

> [T]his physician did not provide any specific work limitations, rather this source checked boxes on a form. The opinion herein is quite conclusory with little to no explanation of the evidence relied upon informing that assessment. Moreover, this opinion remains inconsistent with the medical evidence of record, as well as the physician's own findings upon examination particularly the GAF score of 65.

A.R. 20. Thus, the Court must determine whether any of the following constitutes a specific and legitimate reason for discounting Nockleby's opinion: (1) his purported failure to provide specific work limitations; (2) his use of a check-box form; (3) the purported inconsistency between his opinion and other medical evidence in the record; or (4) the purported inconsistency between his opinion and his own findings, including the GAF score he assessed.

The ALJ's third and fourth reasons for discounting Dr. Nockleby's opinion are specific and legitimate. The other medical evidence referred to clearly includes the neurophysiological evaluation conducted by Dr. Susan Borgaro, Ph.D. As the ALJ noted (A.R. 20), Borgaro's evaluation – conducted two months after Dr. Nockleby's

- 7 -

evaluation – found that Draper's condition had improved since that evaluation. Specifically, Borgaro reported:

> Comparison of his previous testing results on 1/2/13 by [Dr. Nockleby] on scores able to be interpreted indicated a pattern of improvement. Specifically, he demonstrated an improvement in verbal memory from impaired to intact; mild improvement in visual memory; and relatively comparable intellectual resources.

A.R. 1260. Because Dr. Nockleby's opinion was not based on the most recent evaluation of Draper's condition, the ALJ was entitled to discount it.

The ALJ's fourth reason for discounting Dr. Nockleby's opinion is also specific and legitimate. Dr. Nockleby assessed a GAF score indicative of only mild symptoms, but opined that Draper's condition was debilitating. Draper objects that GAF scores are not a reliable measure of an individual's functioning, and notes that the Social Security Administration has recently recognized as much. Doc. 18 at 24 (quoting Soc. Sec. Admin., *Global Assessment of Functioning (GAF) Evidence in Disability Adjudication*, AM-13066 (July 22, 2013), *rev'd* (Oct. 14, 2014)). The ALJ specifically addressed these limitations in her opinion. A.R. 18 (explaining that GAF scores "are highly subjective ratings that can easily vary from one practitioner to the next and generally represent only a 'snapshot' of the presentation of information available from a subject on the day of assessment"). The Court concludes that the ALJ's use of the GAF score assessed by Nockleby was consistent with AM-13066. As that guidance explains, "[t]he problem with using the GAF to evaluate disability is that there is no way to standardize measurement and evaluation," which makes it impossible to reliably compare GAF scores assessed by different physicians or by the same physician at different points in time. AM-13066 at 2. But the ALJ was not attempting such a comparison; she was comparing the GAF score assessed by a particular psychologist during a particular examination to an opinion based on the same examination. It was permissible for the ALJ to rely on the GAF score for this purpose. *See id.* at 3 (explaining that a GAF rating provides "a snapshot opinion about the level of functioning" that is appropriately considered along with other evidence of the person's functioning).

In any case, there are other aspects of Dr. Nockleby's examination that might reasonably be described as inconsistent with his opinion. For example, although the examination reported that Draper's attention-concentration skills were mostly average, that he followed directions without difficulty, and that his IQ, verbal comprehension index, perceptual reasoning index, processing speed index, and working memory index were all average, the opinion stated that Draper would be limited in his ability to understand and carry out even simple instructions. The ALJ reasonably determined that Dr. Nockleby's medical opinion was inconsistent with his own findings

**IV.    Symptom Testimony.**

In evaluating the credibility of a claimant's testimony regarding subjective pain or other symptoms, the ALJ is required to engage in a two-step analysis. First, the ALJ must determine whether the claimant presented objective medical evidence of an impairment that could reasonably be expected to produce some degree of the pain or other symptoms alleged. *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009). Second, if the claimant has made such a showing and there is no evidence of malingering, the ALJ may reject the claimant's testimony about the severity of the symptoms only by giving specific, clear, and convincing reasons for the rejection. *Id.*

The ALJ concluded that Draper's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," but that his "statements concerning the intensity, persistence, and limiting effects of these symptoms [were] not entirely credible." A.R. 17. The ALJ explained:

> Claimant's credibility has been greatly diminished due to glaring inconsistencies observed in the record. While receiving inpatient mental health care in December 2011, treating notes reflected that the claimant's 'behavior seemed to change dramatically when being observed by staff . . . [W]hen he was alone with his wife he was linear, oriented, and calm.' However, when in the presence of treating professionals, his behavior significantly changed and he began alternating between crouching on the ground and screaming and running frantically with his head against the wall. . . .  The claimant's spouse later insisted that the claimant be discharged immediately despite [the fact that the] work up was not complete. . . . A diagnosis of rule out malingering was offered.

A.R. 18-19 (citing A.R. 645-47). The ALJ also noted a stark contrast between the

representations Draper made to his doctors and those he made to the Social Security Administration.  For example, although he reported to the Administration that he was on bed rest and engaged in minimal walking, A.R. 274-75, he reported to his doctors that he took walks three to four times a week for 21-30 minutes at a time, and that he played basketball and worked on motorcycles in his free time.  A.R. 1335, 1359.  The Court concludes that the evidence of possible malingering and the inconsistencies between Draper's testimony to the Administration and his reports to his doctors constitute specific, clear, and convincing reasons for discounting his testimony.  It is therefore unnecessary for the Court to consider the other reasons for discounting Draper's testimony offered by the ALJ.

**IT IS ORDERED** that the final decision of the Commissioner of Social Security is **affirmed**.  The Clerk shall enter judgment accordingly and **terminate** this case.

Dated this 27th day of April, 2016.

David G. Campbell
United States District Judge